## MORRIS et al. v. ATLANTA NORTHERN RAILWAY CO.

1. In view of the allegations in the petition and the character of the injunction sought, the motion to dismiss upon the ground that the questions in the case are moot is overruled.

2. The usual permissive charter of a railroad company does not give rise to any obligation on the part of the company to operate its road at a loss. No contract that it will do so can be elicited from an acceptance of the charter or from putting the road in operation. If at any time it develops with reasonable certainty that its future operation will be at a loss, the company may discontinue operation, though it has not surrendered its charter. "To compel it to go on at a loss or to give up the salvage value would be to take its property without the just compensation which is a part of due process of law."

No. 4739. AUGUST 13, 1925.

Petition for injunction. Before Judge Ellis. Fulton superior court. January 23, 1925.

On January 16, 1925, N. A. Morris filed, in the superior court of Fulton County, a petition in which he alleged: that the Atlanta Northern Railway Company was a public-service corporation created and organized under the laws of the State of Georgia; that prior to and until the 14th day of January, 1925, it had been engaged in the hauling and transportation of passengers and freight for hire on interurban lines between Atlanta and Marietta; that on the day last named the defendant ceased the operation of its road, tore up and removed a part of its line of railroad, and discontinued electric service necessary for the operation thereof, and since that date it has refused to operate any cars on its road between the cities of Atlanta and Marietta; that the defendant operated the line of railway under a franchise granted by the State of Georgia, and it ceased operation and the carrying of freight and passengers without notice to the public and without surrendering its charter or franchise rights; that petitioner is and has for many years been a resident of the City of Marietta; that he is a patron of the defendant road and has been ever since it began operation, paying fares for passage over the same to and from Atlanta, and has used the road for the transportation of freight; that he has purchased a large amount of real estate in the City of Marietta, and has established thereon at large cost storehouses and other places of business, some of which are immediately across the street from the defendant's line of track; that most of these build-

ings have been erected by petitioner within the last three years; that he presumed and believed the defendant would continue to operate its railroad in the future, and upon the faith of this made large investments ·in the property referred to; and that the discontinuance of the operation of the road will depreciate the value of his property. Other parties intervened in the case, making substantially the same showing, and the further showing that they were purchasers of commutation books which entitled them to be carried over the road upon the tickets contained in these books, during the life of the tickets. The prayers of the petition were, that the patrons of the road who may so desire be permitted to intervene and become parties to the cause; that the defendant be enjoined from at any time in the future dismantling the tracks or other properties which are necessary for the operation of the road; and that a receiver be appointed with authority to continue the operation of the road.

To this petition the defendant filed an answer, in which it admitted that it had ceased the operation of its road, and averred that the road was constructed under a permissive charter issued by the Secretary of State, which charter granted the right to construct and operate the line of railway in question. In the answer were set forth the amounts invested in building and equipping the railroad, and the expense incurred in improvements, betterments, additions, and enlargements of the road's facilities. The original investment in building and equipping the road was $555,936, and the improvements, betterments, etc., that had been made brought the total amount expended by the defendant in equipping its road to $933,916. Through twenty years of operation the defendant has not paid any dividends or other returns on its capital stock; it has accumulated no surplus, but on the contrary has incurred a deficit of $32,876. Other facts were set forth in the answer to show that during the period of its operation the receipts of the road had failed to meet expenses by $295,000; that on January 15, 1925, the defendant had no cash whatever in its treasury; that it was impossible to operate the road without loss, on account of the complication of motor busses and steam railway, which parallel its tracks; that under existing conditions it could only operate at a loss. Defendant alleged that to compel it to continue operation at a loss would be to take its property with-

out just compensation, in violation of the fourteenth amendment to the constitution of the United States and a similar provision in the constitution of the State of Georgia; and that to require defendant to operate the road itself, or for the court to take charge of the property through a receiver and operate it, would be denying the equal protection of the law, and in violation of the constitutions of the United States and the State of Georgia.

The defendant filed demurrers to the petition, and petitioners demurred to the defendant's answer. At the hearing, after the pleadings had been read to the court, the case proceeded to trial, the plaintiff introducing as evidence the verified petition as amended, the verified interventions filed, with the ticket-books therein described; a certified copy of the ordinance of the City of Marietta granting a franchise to the defendant; a certified copy of rule 14 of the Public Service Commission of Georgia; and the affidavit of Paul B. Trammell, chairman of the Public Service Commission, wherein he testified that the defendant had not notified the commission of its intention to cease operations, and had made no application to it for authority so to do. The defendant offered in evidence its verified answer; and the evidence closed. After argument of counsel, the trial court took the cause under advisement, and on the 23rd day of January, 1925, rendered a judgment denying the application for a temporary injunction, and the prayer for the appointment of a receiver. The plaintiff sued out a bill of exceptions assigning error upon that judgment.

In the Supreme Court the defendant filed a motion to dismiss the writ of error, upon the ground that the questions presented by this record are now moot, inasmuch as after the refusal of the injunction in the court below, and prior to the presentation of the bill of exceptions, the operation of the road of the defendant in error was resumed in its entirety and has since continued, as is shown by an affidavit signed by one of the attorneys at law for the defendant in error. Appended to this affidavit is a letter written on behalf of the company, showing that it is anxious to promote the interest and prosperity of the territory through which the railroad runs, and stating further that the company will resume operation of the road, beginning on the morning of Saturday, January 24, 1925; that the resumption of service is to be in the nature of a trial to see if it is possible, under the changed con-

ditions and with the hearty co-operation of the City of Marietta and the people of the territory through which the road runs, to operate the railroad without loss; that if it should develop that the road can not be made to pay the cost of service, including a reasonable return on the value of the property, then it will have to be permanently discontinued and dismantled; that the agreement to resume service is not to be considered as committing the company to a continuance of the service, but the right is reserved to discontinue the road in the event it is found that it can not be operated without loss; and that if the operation of motor busses in Marietta should be prevented, but they should nevertheless continue operation from Atlanta over any substantial part of the road, it would be impossible for the road to earn its cost of operation.

*Morris, Hawkins & Wallace,* for plaintiff.

*Colquitt & Conyers,* for defendant.

BECK, P. J. (After stating the foregoing facts.)

1. In view of the allegations of the petition and the prayers for injunction against any attempt in the future to discontinue service upon the road of the defendant company and any attempt to dismantle the road in the future, and in view of the terms, stipulations, and conditions upon which the service on the road in question was resumed, this court is of the opinion that the questions involved in the case are not moot, but must be decided.

2. Under the evidence submitted at the hearing by the defendant, which was admitted without objection, and which was not controverted by any testimony offered by the plaintiffs, the court was authorized to find that the railroad in question had been operated by the defendant since its inception, that is, for the period of about twenty years, at a loss, and that under existing conditions, over which the corporation had no control and could not change, its continued operation could only result in continued and increasing loss to the owners and stockholders of the road; and the controlling question is therefore presented to the court, whether, under such circumstances, the defendant without having previously surrendered its franchise and charter which had been granted by the Secretary of State, could discontinue the operation of the road and the business of hauling freight and passengers for hire. It is not necessary to enter upon an extended discussion of the

question presented. This important question involved here has been considered and determined by the Supreme Court of the United States in cases involving issues and questions which render the decision by that tribunal binding and conclusive upon this court.

In the case of Brooks-Scanlon Co. *v.* Railroad Commission of La., 251 U. S. 396 (40 Sup. Ct. 183), the Supreme Court of the United States held: "A carrier can not be compelled to carry on even a branch of business at a loss, much less the whole business of carriage. On this point it is enough to refer to Northern Pacific Ry. Co. *v.* North Dakota, 236 U. S. 585, 595, 599, 600, 604, and Norfolk & Western Ry. Co. *v.* West Virginia, 236 U. S. 605, 609, 614. It is true that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfil an obligation imposed by the charter, even though fulfilment in that particular may cause a loss. Missouri Pacific Ry. Co. *v.* Kansas, 216 U. S. 262, 276, 278. But that special rule is far from throwing any doubt upon a general principle too well established to need further argument here. The plaintiff may be making money from its sawmill and lumber business, but it no more can be compelled to spend that than it can be compelled to spend any other money to maintain a railroad for the benefit of others who do not care to pay for it. If the plaintiff be taken to have granted to the public an interest in the use of the railroad, it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss. Munn *v.* Illinois, 94 U. S. 113, 126."

In the case of Erie R. Co. *v.* Board of Public Utility Commissioners, 254 U. S. 394 (41 Sup. Ct. 169), the same court held that a railroad corporation can be made, at its own expense and at whatever cost, to abolish highway crossings, including those at streets laid out after the railway was built, and it was insisted in that case that if the same requirements were made for all the grade crossings on the road it would soon be bankrupt; and in the decision it was said: "That the States might be so foolish as to kill a goose that lays golden eggs for them, has no bearing on their constitutional rights. If it reasonably can be said that safety requires the change, it is for them to say whether they will insist upon it, and neither prospective bankruptcy nor engagement

in interstate commerce can take away this fundamental right of the sovereign of the soil." But that court held further that "If the burdens imposed are so great that the road can not be run at a profit, it can stop, whatever the misfortunes the stopping may produce;" and cited the case of Brooks-Scanlon Co. *v.* R. R. Com., supra.

It was held in the case of Bullock *v.* Railroad Commission of Florida, 254 U. S. 513, 520 (41 Sup. Ct. 193) : "Apart from statute or express contract, people who have put their money into a railroad are not bound to go on with it at a loss if there is no reasonable prospect of profitable operation in the future. Brooks-Scanlon Co. *v.* R. R. Commission of Louisiana, 251 U. S. 396. No implied contract that they will do so can be elicited from the mere fact that they have accepted a charter from the State and have been allowed to exercise the power of eminent domain. Suppose that a railroad company should find that its road was a failure, it could not make the State a party to a proceeding for leave to stop, and whether the State would proceed would be for the State to decide. The only remedy of the company would be to stop, and that it would have a right to do without the consent of the State if the facts were as supposed. Purchasers of the road by foreclosure would have the same right."

On February 18, 1925, the Supreme Court of the United States decided the case of Railroad Commission of Texas *v.* Eastern Texas R. Co., and the case of State of Texas *v.* Eastern Texas R. Co., 264 U. S. 79. Those cases were appealed from two decrees in the district court; the first awarding a permanent injunction in the railroad company's suit brought in that court to restrain the railroad commission of Texas and others from interfering with its right to abandon operation and dismantle and salvage its property; the second dismissing a bill to restrain such abandonment, etc., brought by the State in a court of the State and removed to the district court. The decrees in both cases were affirmed. In that case it was insisted by counsel for appellants that the Eastern Texas Railroad Company was under contract to maintain and operate its railroad continuously for the term of its charter, and the company was under statutory duty to maintain and operate its railroad during the term of its charter, and that the Federal courts usually follow the State court in arriving at the contract and

statutory obligations existing between a State and its corporations; and the decisions from the Supreme Court of Texas were cited to sustain the position of counsel in this case. It was expressly insisted that the fourteenth amendment, preventing an unconstitutional taking of property, is not available to a railroad company seeking to escape a contract and statutory duty to continue operation and maintenance of its lines of railroad even at a loss. In deciding those two cases it was held by the court: "The usual permissive charter of a railroad company does not give rise to any obligation on the part of the company to operate its road at a loss. No contract that it will do so can be elicited from the acceptance of the charter or from putting the road in operation. The company, although devoting its property to the use of the public, does not do so irrevocably or absolutely, but on condition that the public shall supply sufficient traffic on a reasonable rate basis to yield a fair return. And if at any time it develops with reasonable certainty that future operation must be at a loss, the company may discontinue operation and get what it can out of the property by dismantling the road. To compel it to go on at a loss or to give up the salvage value would be to take its property without the just compensation which is a part of due process of law. The controlling principle is the same that is applied in the many cases in which the constitutionality of a rate is held to depend upon whether it yields a fair return. Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U. S. 396, 399; Bullock v. Railroad Commission of Florida, 254 U. S. 513, 520; State ex rel. Cunningham v. Jack, 113 Fed. 823, s. c. 145 Fed. 281; Iowa v. Old Colony Trust Co., 215 Fed. 307, 312; Northern Pacific R. R. Co. v. Dustin, 142 U. S. 492, 499; Commonwealth v. Fitchburg R. R. Co., 12 Gray, 180, 190; State v. Dodge City etc. Ry. Co., 53 Kan. 329, 336." This last-quoted case is a direct ruling upon the identical question which we have before us, and upon a question involving the construction of certain provisions found in the constitution of the United States; and its ruling upon those questions is of course controlling upon us.

There can be found dicta in certain of the cases decided by this court which may be construed as laying down a different doctrine, but that the decisions of the Supreme Court of the United States are controlling upon us in regard to questions here for decision has

been recognized in a recent decision by this court. In the case of *Coffee* v. *Gray,* 158 *Ga.* 218 (122 S. E. 687), it was held: "To require a railroad company to continue in business at a loss is beyond the power of Congress or a State. 'Apart from statute or express contract, people who have put their money into a railroad are not bound to go on with it at a loss, if there is no reasonable prospect of profitable operation in the future.' Bullock *v.* Florida, 254 U. S. 513 (41 Sup. Ct. 193, 65 L. ed. 380) ; Brooks-Scanlon Co. *v.* Railroad Commission, 251 U. S. 396 (40 Sup. Ct. 183, 64 L. ed. 323). Nor can a railroad company or a receiver of such company be required to operate a railway on a scale of wages which produce continual loss, and which will finally eat up the corpus of the property. Under our constitutional system of government, there is no power in or out of Congress, in a State, or in the judiciary to compel those who devote their property to the use of the public to operate the same at rates or wages which occasion loss."

Most of the cases which counsel for plaintiffs in error have cited to support their position, and which apparently announce doctrines contrary to what we have held in this case, are distinguishable upon their facts and the issues involved from those cases in which the Supreme Court of the United States has announced the doctrine that we regard as controlling here. We do not deem it necessary to take up these cases in detail and analyze them. Among the cases cited by counsel for plaintiffs in error is that of Ft. Smith Light & Traction Co. *v.* Bourland, decided March 2, 1925, 45 Supreme Court Reporter 249. From the statement of facts in that case it appears that the Ft. Smith Light & Traction Co. owned and operated in that city a street-railway system with twenty-two miles of line; included in that system was a line extending for a third of a mile on Greenwood Avenue. Under the law of Arkansas a street railway is not permitted to abandon any part of its line without leave of the city commission which exercises the power of a public-utility commission. The company applied to that board for leave to abandon the line on Greenwood Avenue, because it was and would be unremunerative. The request to abandon the Greenwood Avenue line was denied, and suit was then brought in a court of the State to set aside the order, on the ground, among others, that it deprived the company of its prop-

erty in violation of the due-process clause of the fourteenth amendment. The trial court denied the relief sought, and the case was finally carried to the Supreme Court of the United States. It was in that case that the court used the language which counsel for plaintiffs in error insist lays down a doctrine that is controlling in the instant case. We think the difference between that case and the present one is at once apparent; for it will be at once seen that the street-railway company was seeking to discontinue merely the operation of a part of its line, while retaining and operating all the remainder of the street-railway system within the municipality. It was upon the issues thus made that the court decided adversely to the Ft. Smith Light & Traction Company, and said, in reference to the issue presented by the record: "The Greenwood Avenue line had been in operation nearly 20 years. No change in conditions had supervened which required the commission to permit the abandonment, unless it were the fact that this particular part of the system was being operated at a loss; that continued operation would involve practical rebuilding of that part of the line; that such rebuilding would entail a large expenditure; and that the system as a whole was not earning a fair return upon the value of the property used and useful in the business. The order complained of does not deal with rates. Nor does it involve the question of the reasonableness of service over a particular line. Compare Atlantic Coast Line R. R. Co. v. Corporation Commission, 206 U. S. 1, 23-27, 27 S. Ct. 585, 51 L. ed. 933, 11 Ann. Cas. 398; Railroad Commission v. Mobile & Ohio R. R. Co., 244 U. S. 388, 37 S. Ct. 602, 61 L. ed. 1216. It merely requires continued operation. We can not say that it is inherently arbitrary. A public utility can not, because of loss, escape obligations voluntarily assumed. Milwaukee Electric Ry. Co. v. Milwaukee, 252 U. S. 100, 105, 40 S. Ct. 306, 64 L. ed. 476, 10 A. L. R. 892. The fact that the company must make a large expenditure in relaying its track does not render the order void. Nor does the expected deficit from operation affect its validity. A railway may be compelled to continue the service of a branch or part of a line, although the operation involves a loss. Missouri Pacific Ry. Co. v. Kansas, 216 U. S. 202, 279, 30. S. Ct. 330, 54 L. ed. 472; Chesapeake & Ohio Ry. Co. v. Public Service Commission, 242 U. S. 603, 607, 37 S. Ct. 234, 61 L. ed. 520. Compare Railroad

Commission v. Eastern Texas R. R. Co., 264 U. S. 79, 85, 44 S. Ct. 247, 68 L. ed. 569. This is true even where the system as a whole fails to earn a fair return upon the value of the property. So far as appears, this company is at liberty to surrender its franchise and discontinue operations throughout the city. It can not, in the absence of contract, be compelled to continue to operate its system at a loss. Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U. S. 396, 40 S. Ct. 183, 64 L. ed. 323. But the constitution does not confer upon the company the right to continue to enjoy the franchise and escape from the burdens incident to its use."

We have made this lengthy quotation from the decision in the case last referred to, because counsel for plaintiffs in error have urged it as a controlling opinion from the Supreme Court of the United States; but when we examine the holdings of the court in view of the issues presented, we see that it is not applicable to the case in hand, while other decisions from the same court, which we have cited and quoted above, do cover the question with which we have to deal in this record. And what we have said in regard to the opinion in the case of the Light & Traction Company v. Bourland is applicable also to the case of *Macon Ry. &c. Co.* v. *Corbin,* 155 *Ga.* 197 (116 S. E. 305).

If the defendant company had discontinued the operation of a part of its line and dismantled the same or was threatening so to do, a different question would arise, and the rulings made in the case of Ft. Smith Light & Traction Co. v. Bourland, supra, and the case of Macon Railway v. Corbin, supra, would be applicable.

It follows from what we have said above that the court did not err in denying the prayer for injunction and receiver.

*Judgment affirmed. All the Justices concur.*